*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

HOWARD SHANE HECTOR,

Defendant-Appellant.

UNPUBLISHED
December 12, 2025
2:06 PM

No. 368501
Ingham Circuit Court
LC No. 19-000052-FH

Before: KOROBKIN, P.J., and MURRAY and MALDONADO, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial convictions of operating under the influence (OUIL) causing death, MCL 257.625(4)(a), and reckless driving causing death, MCL 257.626(4). The trial court sentenced defendant to terms of 86 to 180 months' imprisonment for each of his convictions. Defendant argues that the trial court violated his due process rights by empaneling an anonymous jury and by improperly making a factual determination on an element of the offense. Additionally, defendant argues that the trial court erroneously assessed 15 points for Offense Variable (OV) 5 without record evidence of serious psychological injury to family members, and imposed a disproportionate and unreasonable minimum sentence despite it falling within the applicable guideline range. We affirm.

## I. BACKGROUND

This case arises from a fatal road-rage incident that led to a collision between two vehicles, resulting in the death of one of the drivers. Defendant was operating one of the cars involved, and Wade Warner, who was driving the other vehicle, was killed in the crash. The evidence at trial established that shortly before the accident, Warner was driving behind defendant after defendant had blocked Warner from passing him and that defendant had engaged in aggressive behavior by "brake-checking" Warner at least three times. After the accident, Warner was found nearby, suffering catastrophic injuries, which included his left arm being traumatically amputated. Defendant admitted to the police during their subsequent investigation that he was driving between 60 and 65 miles per hour. The posted speed limit was 55 miles per hour. A blood test revealed that defendant had a blood alcohol level of 0.124 %.

## II. ANONYMOUS JURY

Defendant first argues that he was denied his right to a fair and impartial jury under the Sixth Amendment and his due process rights under the Fourteenth Amendment when the trial court empaneled a jury identified only by numbers and failed to provide a proper cautionary instruction. We disagree.

## A. STANDARD OF REVIEW

To preserve a challenge to the trial court's decision to refer to jurors by number rather than by name, a defendant must object to that decision in the trial court. *People v Hanks*, 276 Mich App 91, 92; 740 NW2d 530 (2007). Defendant failed to preserve this issue for appellate review. Although defense counsel remarked on the record that he was having a hard time assimilating assigned juror numbers, counsel did not raise a clear or specific objection to the use of juror numbers, nor did he assert that the empaneling of an anonymous jury violated defendant's constitutional rights. We review unpreserved issues for plain error, regardless of whether the issue has constitutional implications. *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). Under plain-error review, "a defendant must prove that (1) error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the plain error affected substantial rights." *People v Davis*, 509 Mich 52, 67; 983 NW2d 325 (2022) (quotation marks and citation omitted). "An error has affected a defendant's substantial rights when there is a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *People v Walker*, 504 Mich 267, 276; 934 NW2d 727 (2019) (quotation marks and citation omitted)

## B. ANALYSIS

The Fourteenth Amendment to the United States Constitution protects a defendant's right to due process, including the right to a fair and impartial jury. US Const, Am XIV. There are two primary published cases addressing the issue regarding the use of an anonymous jury: *People v Williams*, 241 Mich App 519; 616 NW2d 710 (2000) and *People v Hanks*, 276 Mich App 91; 740 NW2d 530 (2007). In *Williams*, the Court recognized that withholding biographical information about prospective jurors may interfere with a defendant's rights to conduct meaningful voir dire and to be presumed innocent. *Williams*, 241 Mich App at 522-523. The Court explained that "[i]n order to successfully challenge the use of an 'anonymous jury,' the record must reflect that the parties have had information withheld from them, thus preventing meaningful voir dire, or that the presumption of innocence has been compromised." *Id*. at 523. In both the *Williams* and *Hanks* cases, the jurors were identified by number during trial, but the defendants nonetheless had access to the jurors' biographical information through their questionnaires. *Williams*, 241 Mich App at 523-524; *Hanks*, 276 Mich App at 94. Under the facts of *Williams*, at trial, the jurors were simply referred to by their juror numbers as opposed to their names, and the record did not otherwise support a conclusion that any biographical information was withheld from the parties. *Williams*, 241 Mich App at 523. This Court was not persuaded that the mere use of juror numbers, by itself, constituted the empaneling of an anonymous jury or violated a defendant's due process rights. *Id*. This Court determined "[t]here [was] nothing to indicate that defendant's ability to effectively examine the venire was compromised in any way." *Id*. at 524. This Court further reasoned, in pertinent part, that the record did not show that the use of numbers in any way "undermined the presumption of innocence":

In addition, there is nothing in the record to indicate that the use of numbers undermined the presumption of innocence. There is no suggestion that jurors understood the use of numbers rather than names to be anything out of the ordinary. Thus, there was no suggestion that defendant's trial was being handled in a special way, with the resulting implication that he was generally dangerous or guilty as charged. Other state appellate courts have declined to review claims of prejudice in the withholding of jurors' names in the absence of any evidence in the record of prejudice. [*Id*.]

The Court in *Williams*, did not discern any reason to presume prejudice arising from the trial court's actions. *Id*. at 525. Nonetheless, the Court cautioned trial courts regarding "the potential for prejudice" that could arise from the use of anonymous juries, stating that the procedure should be used only under circumstances in which the safety of jurors or the potential of harassment was implicated. *Id*. Even then, "appropriate safeguards should be carefully followed to assure a fair trial." *Id*.

Similarly, in *Hanks*, this Court "strongly urge[d]" trial courts to advise the jury venire that any use of numbers instead of the names of the jurors was simply for logistical purposes and that the jury ought not to construe this action in any way negatively against the defendant. *Hanks*, 276 Mich App at 94. Also, the record did not yield any indication that the jurors thought that the trial court's use of numbers was significant. *Id*. The Court in *Hanks* also reasoned that the trial court's use of the anonymous jury was limited to the literal sense, the dangers of the anonymous jury were not present, and neither the defendant's right to engage in a meaningful voir dire nor his right to the presumption of innocence was undermined. *Id*.

Recognizing that he cannot satisfy the standard articulated in *Williams* and *Hanks*, defendant urges this Court to adopt the federal approach, contending that consideration of the federal factors did not support the trial court's decision to empanel an anonymous jury. In *United States v Krout*, 66 F3d 1420, 1427 (CA 5, 1995), the United States Court of Appeals for the Fifth Circuit observed that for an anonymous jury to survive constitutional muster, the court must be of the view that the jury is in need of protection, and the court must also take steps to minimize the prejudicial effect to the defendant and to ensure that his fundamental rights are protected. The Court in *Kraut*, reviewed the following factors in determining whether the federal district court properly exercised its decision to protect jurors by impaneling an anonymous jury:

> (1) the defendants' involvement in organized crime; (2) the defendants' participation in a group with the capacity to harm jurors; (3) the defendants' past attempts to interfere with the judicial process or witnesses; (4) the potential that, if convicted, the defendants will suffer a lengthy incarceration and substantial monetary penalties; and, (5) extensive publicity that could enhance the possibility

-3-

that jurors' names would become public and expose them to intimidation and harassment. [*Id*. at 1427.[1]]

However, unlike *Kraut*, this Court's caselaw does not require the trial court to conclude that the jury is in need of protection before impaneling an anonymous jury. *Williams*, 241 Mich App at 523; *Hanks*, 276 Mich App at 94. Therefore, the legal framework relied on by the federal courts, the aim of which is to discern whether the court's action to protect the jury was justified, is not consistent with this Court's binding jurisprudence regarding the empaneling of anonymous juries, and this Court is obligated to follow the principles of Michigan law.

Defendant has not made a meaningful argument that his due-process right to trial by a fair and impartial jury was undermined, aside from the general assertion that the trial court did not advise the venire, consistent with this Court's "strong urg[ing]" in *Hanks*, 276 Mich App at 94, "that any use of numbers in lieu of jurors' names [was] simply for logistical purposes" and that the jury should not consider this practice as "a negative against the defendant." As an initial matter, similar to *Hanks*, the record reflects that both parties were able to extensively question the potential jurors during voir dire, and the record does not suggest that the jurors determined that there was any particular significance to the trial court referring to the jurors by number rather than name. Additionally, the present facts are analogous to the factual scenario in *Williams*, 241 Mich App at 524, because there was no suggestion that defendant's trial was being handled in a special way, nor was there any implication arising from the use of numbers that defendant was dangerous or guilty as charged. While the record did not reflect that questions of harassment or safety had arisen that necessitated the impaneling of an anonymous jury, *Williams*, 241 Mich App at 525, as was the case in *Hanks*, 276 Mich App at 94, the jury was anonymous "only in a literal sense," and under those circumstances, the inherent dangers of an anonymous jury are not present. The record also does not indicate that any biographical information regarding the jury venire was withheld from the parties that interfered with the ability to conduct a meaningful voir dire or that jeopardized defendant's presumption of innocence. Additionally, the trial court informed the jury during final jury instructions that defendant was presumed to be innocent, and this Court presumes that the jury followed the court's instructions. *People v Zitka*, 335 Mich App 324, 348; 966 NW2d 786 (2020). Therefore, while the record does not support a conclusion that the jury was advised that the use of numbers in lieu of the names of the jurors was only for logistical reasons, because defendant's ability to conduct voir dire was not impacted and the presumption of innocence was safeguarded, he has not made a persuasive showing of plain error arising from the trial court's reference to the jurors by number.

---

[1] While federal caselaw is not binding on this Court, it may be considered persuasive. *People v Gillam*, 479 Mich 253, 261; 734 NW2d 585 (2007).

## III. TRIAL COURT'S RESPONSE TO JURY QUESTION

Defendant next argues that the trial court erred by giving an instruction to the jury that was tantamount to a directed verdict of guilt. We disagree.

### A. PRESERVATION OF ISSUE AND STANDARD OF REVIEW

While defense counsel raised an objection to the trial court's supplemental instruction on the basis of the wording of the instruction, he did not raise the constitutional challenge that he asserts on appeal, leaving this issue unpreserved. *People v Kimble*, 470 Mich 305, 309, 312; 684 NW2d 669 (2004). Accordingly, this issue is subject to plain-error analysis. *Davis*, 509 Mich at 67.

### B. PROVINCE OF THE JURY

In addition to the Fourteenth Amendment, the Sixth Amendment to the United States Constitution protects a defendant's right to trial by jury. US Const, Ams VI and XIV. The defendant's right to have a jury, rather than a judge, render a conviction of guilt is an "important element" that is part of the Sixth Amendment's protection of an accused's right to trial by an impartial jury. *Sullivan v Louisiana*, 508 US 275, 277; 113 S Ct 2078; 124 L Ed 2d 182 (1993). For that reason, the Court will not allow a jury instruction that improperly takes the jury's decision away and is effectively the same as the judge giving the verdict, "tantamount to a directed verdict from the bench." *People v Gaydosh*, 203 Mich App 235, 237; 512 NW2d 65 (1994).

After retiring for its deliberations, the jury returned with a question for the trial court. Specifically, the jury asked the trial court in a written note the following question:

> For the second element of [M Crim JI 15.14a], can evidence of intoxication be used to find willful or wanton disregard?

The jury's question pertained to Michigan Model Criminal Jury Instruction M Crim JI 15.14a, which states, in pertinent part, with regard to the element of willful or wanton disregard to establish the crime of reckless driving causing death:[2]

> (3) Second, that the defendant drove the motor vehicle in willful or wanton disregard for the safety of persons or property. Willful or wanton disregard means more than simple carelessness but does not require proof of an intent to cause harm. It means knowingly disregarding the possible risks to the safety of people or property.

---

[2] In *People v Jones*, 497 Mich 155, 167; 860 NW2d 112 (2014), our Supreme Court explained that the elements of reckless driving causing death under MCL 257.626(4) are (1) the person operated a motor vehicle in willful or wanton disregard for the safety of persons or property, and (2) the operation of that vehicle caused the death of another person.

After conferring with the parties, the trial court responded to the jury in the following manner, stating:

> The question is: For the second element of [M Crim JI 15.14a], can evidence of intoxication be used to find willful or wanton disregard?

> That second element, again, for the record, is that the defendant drove the motor vehicle in willful or wanton disregard for the safety of persons or property. Willful and wanton disregard means more than simple carelessness but does not require proof of an intent to cause harm. It means knowingly disregarding the possible risks to the safety of people or property.

> So the overall instruction about evidence is all the evidence that you believe should be considered in reaching your verdict. So the first question is if you believe evidence of intoxication while the defendant was driving and if you believe it shows willful or wanton disregard for the safety of persons or property, then it is proper for you to use the evidence of intoxication to show that that element is established. Okay?

In providing this supplemental instruction, the trial court followed the language of M Crim JI 15.14a(3), after having previously given the jury the identical instruction regarding the legal meaning of willful and wanton disregard in its final jury instructions. The trial court's supplemental instruction also informed the jury that it should consider the evidence it determined credible in reaching its verdict. The trial court had previously instructed the jury in its final instructions consistently with M Crim JI 3.1.

M Crim JI 3.1 addresses the duties of the court and the jury, and states in pertinent part:

> (3) As jurors, you must decide what the facts of this case are. This is your job, and nobody else's. You must think about all the evidence and then decide what each piece of evidence means and how important you think it is. This includes whether you believe what each of the witnesses said. What you decide about any fact in this case is final.

> \* \* \*

> (5) To sum up, it is your job to decide what the facts of the case are, to apply the law as I give it to you, and, in that way, to decide the case.

The court's instruction was a clear attempt to remind the jury of its obligation under M Crim JI 3.1(5) to decide what the facts of the case were, to apply the law, and decide the case in that manner. While the court's instructions may not have complied with the Michigan Model Criminal Jury Instructions verbatim, a review of the instructions as a whole, and in their proper context, reflects that while the instructions may have been imperfect, they nonetheless fairly presented the issues to be tried and sufficiently protected the rights of defendant. See *Gaydosh*, 203 Mich App at 237.

Accordingly, the record demonstrates that the trial court's supplemental instruction did not direct a verdict in favor of the prosecution on the charge of reckless driving causing death. Rather, the court properly instructed the jury on the required element of wanton and willful disregard necessary to establish that offense. The court further cautioned the jury that it alone was responsible for evaluating the evidence, determining witness credibility, and finding the facts. Contrary to defendant's contention, the trial court made no factual determinations that should have been left to the jury. Instead, it accurately informed the jury—consistent with Michigan law and the Michigan Model Criminal Jury Instructions—that it could consider all admissible evidence in reaching its verdict. Therefore, defendant's claim that the court effectively directed a verdict of guilty and thereby violated his Sixth Amendment right to a jury trial is without merit, as he has failed to establish plain error affecting his substantial rights.

## IV. SENTENCING

Defendant next raises two challenges with respect to sentencing. One involves the assessment of points for OV 5, and in his second claim of error related to sentencing, defendant challenges the proportionality of his sentences. We will consider each of defendant's arguments in turn.

## A. STANDARDS OF REVIEW

The interpretation and application of the sentencing guidelines are reviewed by this Court de novo, the trial court's factual findings are reviewed for clear error, and its findings must be supported by a preponderance of the evidence. *People v Sours*, 315 Mich App 346, 348; 890 NW2d 401 (2016). The trial court's findings are clearly erroneous if, after a review of the record, this Court is left with a definite and firm conviction that the trial court made a mistake. *People v Abbott*, 330 Mich App 648, 654; 950 NW2d 478 (2019). Whether the facts as determined by the trial court meet the requirements of the applicable statute is a question of statutory interpretation, which is also reviewed de novo. *Id*.

With regard to defendant's challenge to the proportionality of his sentences, our Supreme Court has confirmed that all sentences are reviewed for reasonableness, which requires this Court to determine if the sentence is proportionate to the seriousness of the matter. *People* v *Posey*, 512 Mich 317, 352; 1 NW3d 101 (2023) (opinion by BOLDEN, J.). In reviewing a sentence for reasonableness, the following legal principles are to be considered:

> [T]he proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the "principle of proportionality" set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), "which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." [*People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017).]

Our Supreme Court has further instructed that sentencing decisions are to be reviewed for an abuse of discretion to determine if they violate the principle of proportionality. *Posey*, 512 Mich at 325 (opinion by BOLDEN, J.).

B. ANALYSIS

1. ASSESSING 15 POINTS FOR OV 5

Defendant contends that the trial court clearly erred in assessing 15 points for OV 5 because the record did not support a conclusion that the family of the victim suffered serious psychological injury as contemplated by MCL 777.35(1)(a). Under OV 5, 15 points are to be assessed under circumstances involving "[s]erious psychological injury requiring professional treatment . . . to a victim's family[.]" MCL 777.35(1)(a). MCL 777.35(2) further provides: "Score 15 points if the serious psychological injury to the victim's family may require professional treatment. In making this determination, the fact that treatment has not been sought is not conclusive."

In interpreting subsections (1)(a) and (2) of MCL 777.35, our Supreme Court has determined that the statute, read as a whole, does not require proof that a family member has actually received, or intends to seek, professional treatment arising from the psychological injury. *People v Calloway*, 500 Mich 180, 186; 895 NW2d 165 (2017). Instead, an assessment of 15 points under subsection (1)(a) is appropriate if the injury may require professional treatment. *Calloway*, 500 Mich at 186. The Court in *Calloway*, also explained the legal principles that a sentencing court should consider in assessing 15 points for this OV:

> Thus, in scoring OV 5, a trial court should consider the severity of the injury and the consequences that flow from it, including how the injury has manifested itself before sentencing and is likely to do so in the future, and whether professional treatment has been sought or received. However, even when professional treatment has not yet been sought or received, points are properly assessed for OV 5 when a victim's family member has suffered a serious psychological injury that may require professional treatment in the future. [*Calloway*, 500 Mich at 186.]

In making this determination, the trial court may properly consider a family member's emotional response to the death of the victim, as well as any information concerning the family member's grief, anger, and heartbreak over the loss of the victim. *Id*. at 187. Simply put, the record should include evidence of the severity of the injuries and how they continued to affect the victim's family over time. *Id*. at 189.

In the present case, Warner's mother, Annette Warner, in statements in the presentence investigation report (PSIR), recounted that she believed that Warner's death was the reason that his 13-year-old son took his own life 39 days following the motor vehicle accident. Annette also described the "daily struggle" she encountered with "physical heartache and grief," which she stated was almost too difficult to bear most days. Annette also stated that she experienced many "sleepless nights," feelings of anxiety, and not being able to eat because she was sick to her stomach. In the PSIR, Annette also informed the court that the loss of Warner had drained the joy out of her life and that of her family members. Since Warner died, the holidays had been dramatically altered for the entire family, and Annette described the "empty chair" at the family table. Annette also described that Warner's nephew was very close to Warner, and had spoken to him moments before the life-altering motor vehicle accident. The two shared a "special bond," Warner would get his nephew on the school bus every day, and the two enjoyed fishing and playing Xbox games and a farming simulator together. As a result of Warner's death, his nephew

repeatedly experienced fears that when his parents left home, they would never return. Warner's nephew also experienced sleepless nights and anxiety, crawling into bed with his parents most nights. Warner's parents also missed a significant time of work dealing with their mental anguish after losing their son.

At the sentencing hearing, Warner's girlfriend, Janell Henderson, also described the pain she experienced after missing holidays, birthdays, and quiet occasions sitting on the front porch with Warner as a result of defendant's actions. Henderson also described the "emotional trauma" that she experienced because of defendant's actions in part because of tending to Warner as he lay dying in a field after his arm was traumatically amputated during the accident. Henderson also had to inform Warner's parents that he was deceased, "breaking [their] . . . hearts." Warner's former girlfriend, Melissa Cobb, also testified that the son she shared with Warner had taken his own life 39 days after the motor vehicle accident, and she attributed his actions to the loss of his father, reasoning that their son "died from a broken heart." Cobb also stated that the family was "collectively griev[ing]" the inability to hug and kiss Warner and have his presence at holidays and family events.

After considering the statements of Warner's family members in the PSIR and at sentencing, we are not persuaded that the trial court erred in concluding that at least five members of Warner's family experienced a traumatic and significant loss amounting to a "serious psychological injury" that may require professional treatment as contemplated by MCL 777.35(1)(a). The trial court also properly complied with Michigan caselaw, *Calloway*, 500 Mich at 186, in considering the severity of the psychological injuries that the family members incurred, the consequences that flowed from such injuries, including how the injuries manifested themselves before sentencing and were likely to do so in the future, and whether the family members had sought professional treatment. This is particularly the case where the family members shared their opinion that Warner's preteen son killed himself within 39 days of losing his father. Similar to the facts of *Calloway*, *id*. at 189, "[t]here was ample evidence of the seriousness of the injuries and their long-lasting effects to support the trial court's decision to assess 15 points for OV 5." Accordingly, defendant has not demonstrated that the trial court erred in its assessment of 15 points for OV 5.

## 2. PROPORTIONALITY OF THE SENTENCE

Defendant next argues that the trial court abused its discretion in imposing terms of imprisonment of 86 to 180 months for his convictions of OUIL causing death and reckless driving causing death.

In *Posey*, 512 Mich at 352 (opinion by BOLDEN, J.), our Supreme Court acknowledged that appellate courts are to review all sentences imposed for reasonableness, which requires the reviewing court to evaluate whether the sentence was proportionate to the seriousness of the matter. A sentence that is imposed within the guidelines' recommended range is presumed to satisfy the principle of proportionality unless the defendant is able to overcome that presumption. *Id*. at 357. In *People v Boykin*, 510 Mich 171, 183; 987 NW2d 58 (2022), our Supreme Court explained that within the range recommended by the statutory sentencing guidelines, which are now advisory rather than mandatory, the sentence imposed by the trial court should be tailored to the particular circumstances of the offense and the offender. As part of that endeavor, the trial

court is to give due consideration to the goals of sentencing: the potential reformation of the offender, the protection of society, the discipline of the offender, and the aim of deterring others from committing similar offenses. *Id*.; *People v Snow*, 386 Mich 586, 592; 194 NW2d 314 (1972).

A review of the record confirms that defendant has not overcome the presumption that his sentences satisfy the principle of proportionality. *Posey*, 512 Mich at 357 (opinion by BOLDEN, J.). The gravamen of defendant's argument on appeal is that the trial court did not tailor his sentence in a manner that reflected both the seriousness of the offense and the offender. In support of his argument, defendant cites a litany of factors that he claims that the trial court did not properly consider in rendering sentence, but the record does not support his contention. For example, contrary to defendant's argument that the trial court did not consider whether he had a criminal record, our review of the record reflects that the trial court evaluated the prior record variables in the PSIR in determining the recommended minimum sentence range. The trial court also reviewed the PSIR, which contained defendant's criminal record. The prosecution also updated the PSIR at sentencing because the original PSIR inadvertently omitted defendant's July 8, 2018 conviction of operating a vehicle while intoxicated, MCL 257.625(1)(a). While the trial court did not expressly state that it had taken into consideration defendant's inpatient rehabilitation treatment and the fact that he professed to be no longer drinking alcohol, the record reflects that the trial court reviewed the PSIR, which included that information. Similarly, the record reflects that the trial court listened carefully to defendant's allocution in which he acknowledged being an alcoholic and not drinking alcohol since the accident. Therefore, defendant's arguments that the trial court did not consider his decision to stop drinking and his inpatient treatment are not persuasive.

Similarly, the record reflects that the trial court considered defendant's statements of regrets and remorse for his actions and the pain inflicted on Warner's family because of the motor vehicle accident. However, in expressing his remorse, defendant notably did not take full responsibility for his actions. Specifically, defendant also claimed, contrary to the evidence admitted at trial, that it was Warner who had a temper and who had "chased [defendant] down" while the two were driving on Bellevue Highway. After hearing both from defendant and defendant's father, the trial court observed that the evidence at trial, as well as statements in the PSIR to which defendant had not objected, established that defendant was the individual who engaged in a series of three "brake-checks" in front of Warner's vehicle. It is apparent from the trial court's comments at sentencing that it found Henderson's recitation of the circumstances leading to the motor vehicle accident to be more credible. The trial court also noted that statements in the PSIR did not support defendant's contention that he immediately went to Warner's aid. Rather, instead of doing "the decent thing" of checking to see if Warner was safe, defendant was observed by a witness removing cans from his vehicle in the moments after the accident. The evidence at trial also contradicted defendant's version of events, as Henderson testified that while she saw defendant's truck on the east side of the road after the accident, it was Henderson alone who immediately tended to Warner as he lay in a patch of weeds and stopped breathing.

Further, in imposing a minimum sentence at the top of the guidelines' recommended range, the trial court also acknowledged that factors related to the offenses themselves were not taken into consideration by the sentencing guidelines. For example, the court considered that not only was defendant intoxicated at the time of the motor vehicle accident, but that he was driving extremely recklessly and that the accident took place after defendant had brake-checked three times in rapid succession. While the trial court also assessed 15 points for the serious

psychological injuries of family members of Warner, it also stated that the guidelines did not adequately account for the fact that not one, but several, members of Warner's family had incurred such injuries, and that one of Warner's children took his own life only 39 days after the accident. Therefore, given that the record contravenes defendant's assertion that the trial court did not consider his minimal prior criminal record, his inpatient rehabilitation, the fact that he had stopped drinking alcohol, and his statements of remorse, defendant has simply not overcome the presumption that his sentence, which fell within the guidelines' recommended range, satisfied the principle of proportionality. *Posey*, 512 Mich at 357 (opinion by BOLDEN, J.).

Affirmed.

/s/ Daniel S. Korobkin
/s/ Christopher M. Murray
/s/ Allie Greenleaf Maldonado